As you know, it's for sure. One justice has some medical problems, not not major. So we'll proceed and speak up because we're recording, hopefully, because it goes to Springfield and it comes back to here. Good morning, sir. My name is Steve Buse. I'm representing Charles and Stacey Williams. May it please the court. This is a case involving a lawsuit filed by Charles and Stacey Williams for the appearance of Brandon Williams, the decedent, who's their son. It's a case consisting of cause of actions based on wrongful death, survival action, and the family expense statute. Each of the accounts that were plugged in this case involve intentional and willful and wanton counts of conduct of the defendants that resulted in severe emotional distress and injuries to their son and ultimately in his death. The issues that we've asked the court to decide in this case is whether or not the trial court erred when it granted summary judgment for the defendants, and secondly, whether the trial court erred when it denied the plaintiff's motion to amend their complaint. In October 2008, the defendants decided to conduct an investigation with regard to alleged misconduct by several students, including the decedent, Brandon Williams. At that time, the defendant, Brian Sharon, was a superintendent of the school district. He had already adopted a policy pertaining to disciplinary matters in the form of an agenda handbook. And in the handbook, it noted in particular that the principal and the superintendent and other employees of the school district were to work with the parents when there were suspected violations of students involving disciplinary matters. When they undertook their investigation, it lasted over a period of three different days, one on October 24th, which was a Friday, Monday, October 27th, a Monday. The final day was on October 29th, which was on a Wednesday. There's some facts in dispute among the parties and the witnesses as to what actually occurred on those dates. The plaintiffs have alleged, and several of the witnesses have been disclosed in this case, consist of other students. In this case, we've alleged that the defendants, in the various sessions of either questioning or interrogation of the students, including Brandon Williams, involving threats of a Class 1 felony, threats of jail time, having a permanent felony record, difficulty ever applying because of these felony records for jobs, expulsions from school, and having to pay over $16,000 in damages because of damage to the school. There were also allegations of physical and verbal conduct on the part of the defendants involving screaming and yelling at Brandon and the other students, name calling, pounding of a fist, kicking of a waste can, allegations of calling him a liar that he disgusts them, etc. I thought the facts said that the master key was returned, but the question is probably were there other keys made. Yes, sir. So it really wasn't loss of the key. That's true. It was stolen at one time, reappeared, and there's a question of whether it had to replace the locks. It was returned by the students, correct? Some of these facts are contested and other ones are not. Mr. Chiron, the principal, or the superintendent, admitted he had kicked the can. They had made suggestions of a felony record, and he denied most of the other ones. Patti Doyle, the principal, agreed also that he had kicked the can, that he had been isolated from the other students at the time. There was discussions by them, they admitted, about the threats of felonies, but they denied most of the other allegations. What is not in dispute is that neither defendant had contacted the parents, and they had no knowledge about any of these interrogation sessions until after the third one occurred. It is also not in dispute the first time that either parent found out anything about the alleged wrongful conduct of their son or any of these interrogation sessions was on Wednesday, October 29th, approximately 430. My question is a little confusing. He said they weren't notified until after the third one. Had they already found their son at that time? What had happened, he came home at 430.  I understand they were at work, I thought. They were at work, and they attempted to contact him, and he had left work, and he had left a message for the husband who was already gone, and then I think an attempt was to try to contact the mother, and she was not available either, either by phone. So attempts were made after the last session to contact the parents. He eventually came home at approximately 430 at that time and found that his son had shot himself. But had he been notified at that time or was he notified? Had not been notified. When he came home, the house was empty. He went into the back deck, found his son had used a gun, shot himself, killed himself, died the next day. And there were a number of days between these sessions. This was after the third session. Yes, sir. The first session was on Friday. The second one was on Monday. The last one was Wednesday. So there was an opportunity to try to contact the parents of these kids. On any of those days. In our case, we filed a second amendment complaint, and I think it was inadverted by the defendants, but they said in their brief that this case was about the defendant's failure to notify the parents. That's not the only allegation in this case. In our case, we're saying that they failed to follow the policy in question, the written policy. But more importantly, or equally important, we've alleged several acts, at least 12 separate acts of intentional conduct involving both verbal and physical conduct directed specifically at Brandon that resulted in severe emotional distress and his death. What was the reason that you waited a substantial amount of time to request the filing of a third amendment complaint before the summary judgment question? As to that issue, on the amendment complaint, when Judge Doyle had entered an order allowing the second amendment complaint to be filed, that was filed on February 8th, 2010. The depositions of the defendants were not taken until October 5th and October 6th of 2011. There were five additional witnesses, the students, that were taken in March of 2012. At the time that Mr. Sharon was deposed, he admitted at his deposition that he had a duty and a responsibility to supervise. It was at that point that, in my mind, it would be appropriate to file an amendment complaint on supervision. I wanted to take the additional five witnesses to find out additional elements in that regard. I took their depositions, and less than a month after the last depositions were taken, I did file a motion for leave to amend. So you were going to add a count on a supervisory theory? Yes, sir. I see. And that was the distinction among the other actions that were filed at that time. Among the cases, because the defense here by the defendants is that they are immune from any tort liability on the basis that they would determine policy and exercise discretion. I'm sure you're familiar with the cases that were decided by both parties. I believe the most important case for the court to consider is the Valentino case. The Valentino case is the most applicable and most similar to the facts that apply in this case. In Valentino, it was a teacher who was obstructed. He was the director of operations, and he sued Mr. Hillquist, who was his supervisor. And in that case, the defendant also claimed immunity, saying they were determining policy and exercising discretion and evaluating the plaintiff in that case. But what was important is the court determined that the verbal and physical acts of intentional conduct conducted toward Mr. Valentino did not amount to either exercise of discretion or determining policy. And that is the similar facts that we have in this case. Importantly also in Valentino, the defendants filed a motion for summary judgment. However, in that case, the trial court denied it, and the first district affirmed, deciding that it was a jury question on whether or not the intentional conduct of the type in that case crossed the line as far as whether they can claim their acts were discretionary or a determination of policy. We believe that case is the most applicable one to this case as well. How far are the defense in this case allowed to go and cloak themselves with immunity, saying that its discretionary acts are determining policy based on all the intentional conduct they have? The cases that the policy and counsels decided with regard to lack of the bullying cases, for example, the Haskell case had to do with no intervention. The student was hurt because they failed to prevent that from happening. The Alvarez case, they leaked confidential information concerning some bullying activities that go on. They cited several equipment cases, failing to provide a ladder involving a rope. None of those cases involved intentional conduct of the kind that happened in our case and the kind that happened in the Valentino case. Does your position on intentional conduct include intentional infliction of emotional distress? Yes, sir. And what count is that? They were at all counts that I've alleged in the case, alleged intentional conduct. We also have counts that there was also a conscious disregard and utter indifference as well. And there's only three counts having to do with failing to follow the handbook itself, failing to follow the policy. But there are 14 additional allegations of serious intentional conduct that ultimately led to his emotional distress and his decision to kill himself. And the allegation of intentional infliction of emotional distress is targeted at whom? Both defendants. Both defendants. Yes, sir. And Ms. Doyle was there during the time the interrogations took place, and she participated in calling them the felons. She'll have a felony record, et cetera. Mr. Chiron was the one who isolated Brandon, five, ten minutes, alone, picking the can, pounding the desk, all the other things that he did. We think that that crosses the line in this case, and the Valentino case said that as well. I expect counsel may be citing some other decisions behind me that I'll reply to. But that is our basic position with regard to the error we believe the court made in dismiss or in granting the summary judgment. As to the motion to amend, you're familiar with all the requirements that are necessary there. This case was still in the pleading stage. The Loyola Academy case, the Supreme Court said that has a particular significance. There was no order entered for a trial, no order for completion of discovery, no order entered for filing dispositive motions, including a motion to amend. So there's no claim of prejudice there. I made a mistake in my reply brief saying that I'd file it within three years, so it's actually about three weeks after three years. But I cited numerous cases in my brief in which the courts interpreted the statute liberally, allowing in some instances five amended complaints, four amended complaints, or three amended complaints. We're asking for a third amended complaint. And the reason, again, for the delay, as I mentioned before, we were taking depositions. It was a long, drawn-out case. You could tell from the record we had been to court numerous times with motions to dismiss and other matters. There was some difficulty getting some of the depositions done. We also believe that we would cure any defect because we are now alleging a count on failure to supervise. This is something Judge Doyle alluded to in one of his orders about the failure of the plaintiffs to plead thus far, a failure to supervise. And it was after that Mr. Sherome was deposed that he admitted this duty. He admitted to this duty at that point. We sought to amend it. We also made reference to the statute that pertains to supervision and that there is an exception in that particular statute for willful and wanton conduct. If you can prove that, that eliminates any immunity on their part. So we think that it's important to look at that combined effect. In this case, Mr. Sherome's admission of the duty and responsibility to supervise as well as what is provided for in the statute. Opposing counsel refers to one of the statutes, section 5-24, that makes reference that teachers who stand in the same position as parents may supervise, as the language may be exercised for the safety and supervision. I think that is not intended to be limiting their duties of supervision. I think it encompasses the duty to supervise, especially in the context of this case when Mr. Sherome himself says, yes, I have a duty to supervise. And I think it makes sense as a matter of public policy in this state that when we want our teachers to supervise, we wouldn't want them to watch children leave the playground and walk into the street. We wouldn't want our teachers to do nothing if one student in the classroom is injuring another person. So I think it makes sense. The law in this state, is there a duty to supervise? The question is whether or not there's grounds to hold them accountable based on their willful and wanton conduct, which is what we have pled. So we respectfully request this court to reverse the trial court's decision on the motion for summary judgment. We think it's a question of fact. We think the Valentino case, while perhaps maybe not on point exactly, is the most likely case, most similar case to the one in question. And in that case, as said before, it was one in which the trial court thought it was appropriate. Let's let the jury decide this matter and not leave it up to the defendants alone and the court as a matter of law to decide if they have crossed that line as far as determining our conduct is immune simply because we decided that we're exercising discretion or determining policy. Thank you.  Thank you, Counsel. Good morning, Your Honors. May it please the court, my name is Candace Kussmer. I'm here on behalf of defendants at L.E.'s, Valmeyer, Community School District Number 3, Superintendent Brian Charon, and Principal Hattie Doyle. In this case, the trial court appropriately granted summary judgment under the Illinois Tort Immunity Act because Superintendent Charon and Principal Doyle both exercised discretion and determined policy in this student disciplinary matter involving student theft, vandalism, unlawful entry to the school, and illegal drug use at the school. The act is premised on the idea that public officials be allowed to exercise judgment when making decisions without fear of a good faith mistake imposing liability. The Illinois Supreme Court has stated that Section 2-201 affords the most significant protection under the act. It provides an absolute defense to a liability claim without regard to the degree of conduct. The act specifies that it provides immunity for determinations of policy when acting in discretion even though abused. Immunity applies even if this court characterizes Superintendent Charon's actions as corrupt or malicious, willful and wanton, or even intentional. So your position is taking the second amended complaint, which is in front of us, that's the one in front of us, construing that in the light most favorable to the plaintiffs, that these were intentional acts and intentional infliction of emotional distress. It's your position as a blanket proposition that the Tort Immunity Act protects these two defendants and the school district? Yes, the case law supports the fact that the act protects public employees if they are determining policy and exercising discretion, even if the acts are considered to be intentional. How is the action of dealing with a particular individual in a disciplinary situation a determination of determining policy? Not how do we deal with this particular situation, but how does that expand into a determination of policy that by its nature, if it's policy, would be applicable to other individuals in similar circumstances? Because in this case, the Valmeier Community School agenda set forth certain guidelines for the school to follow with regard to discipline. It did not state exactly how to handle certain situations. It left the policy making to the administrators to take the certain facts to a specific incident and determine how the policy is going to work towards this particular student. What's the best discipline? What's the best way to find out who's involved and who's not involved? To use their discretion in determining the disciplinary policy to a particular student. Well, if the school district agenda determined these are the criteria, that's the policy. How is applying it to an individual a determination of policy? That seems to be contradictory within the terms that you set out. Well, the school agenda itself calls itself a guideline. As far as the consequences for discipline, it says here are the guidelines. And we've cited the Bowers case and the Johnson case in support of the position that it doesn't list specifically how to handle a situation. No, I realize that. They've reasonably taken the position they cannot anticipate every situation to which it would be applied. But is an application of the guidelines an application of policy? And the guidelines are actually the policy and not the application. And I would say that the actions that Superintendent Charron and Principal Doyle took were the determinations of the policy using the agenda as guidelines to determine how to handle the situation. In that regard, we've cited the Albers case. That case involved a student's claim of emotional distress after certain names of bullies were published without authorization. And in looking at that case, the court determined that the school principal dealing with a disciplinary matter must balance competing interests and make a judgment as to what balance to strike among them. Here, Superintendent Charron and Principal Doyle were involved in a complex decision-making process over a period of days that required the balancing of competing interests and making judgment calls that would most effectively satisfy them. Here, the interests were that of the students, determining which students were correctly involved in the situation and ruling out the ones that weren't. It involved the interests of the school in maintaining discipline amongst the students and making sure that the school was safe. It involved the interests of law enforcement. Principal – I'm sorry, Superintendent Charron and law enforcement were in contact regarding whether to prosecute this matter or handle it internally. And it was decided to handle it internally. Well, they decided to handle it internally. How could you be a felon? I'm sorry? How could you become a felon? Did the school declare you a felon? Well, I think by the time they got to that point where it was just Superintendent Charron and the decedent alone in the room, it had been over a period of days. The decedent had denied involvement in the Master Key incident as well as the concession stand incident. And I think there was a point of frustration where, okay, now we know that you're involved in both to some degree and you need to tell me exactly what your involvement was and here's what could happen to you. There was a point of frustration there. Defendants maintain that it was appropriate under the circumstances, but even if this court thinks that it wasn't, still Section 2201 maintains that immunity is imputed to Defendant Charron. So, in other words, you're saying it's not a question of fact that they go too far? No, I'm saying even taking plaintiff's version of the facts – It's not a question of fact. Right. So, in addition, Superintendent Charron and Principal Doyle also exercised their discretion. Discretionary acts are making a decision as to whether or how to perform an act, and they did that. As I stated, the agenda was not policy. By its own language, it left room for interpretation for Principal Doyle and Superintendent Charron to handle disciplinary matters as they saw fit. We also cited the recent case of Haskell v. Williams. It's a 2013 case out of the 4th District. In that case, which we believe is the most similar to the case at Barr, similar allegations. Plaintiffs sued a principal, superintendent, and school district for violations of the school code, fraud, and intentional infliction of emotional distress, and also retaliation. It was a bullying matter where the defendants acknowledged that there was a school policy defined to prohibit bullying activities but required the development of a program to implement the policy. The defendants there testified that they were using their discretion to determine policy for specific situations. Valentino is not similar to this case at all. As he stated, it involved a college vice president and former employee where there were allegations of verbal and physical abuse for five years. It involved pushing, kicking, grabbing, twisting, pushing a face against the window to this employee. None of that happened here, and it happened over 100 times. The court there said that the defendant had creatively attempted to frame the conduct as criticisms of the employee's job performance, but that was not the case because the complaint alleged battery. So that's the difference between Valentino and this case. Valentino alleged battery, and because there were actions involving battery, the court held that the immunity did not apply. And if I understand your position, and correct me if I'm wrong, you're saying that the Tort Immunity Act is broad enough in its language to insulate the defendants from these actions even if we were to characterize them, as the plaintiff has characterized them, as intentional torts? Correct. So for these reasons, Your Honor, we submit that the trial court appropriately granted summary judgment under the Illinois Tort Immunity Act. As to the motion for leave to amend, the trial court did not abuse its discretion in denying plaintiff's motion for leave to amend. A plaintiff's right to amend is not absolute, and as you know, a plaintiff must show four factors in order to determine that the trial court abused its discretion. That the amendment would have cured the pleadings, that other parties did not sustain prejudice, the amendment was timely, and that there had been no previous opportunities to amend. Here, a plaintiff cannot satisfy all four of those requirements. The primary consideration is whether the amendment would further the end of justice. Here, it would not. There was no abuse of discretion. Plaintiff's motion to amend, frankly, was a last-ditch effort to end-run the trial court's probable granting of the motion for summary judgment. Actually granting the motion would have created an ingest to the defendants. First of all, the amended pleading would not have cured the defect. Plaintiff says that he did add new facts because he stated that the action in the proposed amendment complaint were under the direction, supervision, and control of Superintendent Charon and Principal Doyle. But that's it. That's the only new buzzword language that was included. Despite the fact, as plaintiff acknowledged, there was extensive discovery taking place over the last couple of years involving several depositions of the parties and then also the other students involved in the situation. There were no new facts alleged in this proposed amendment complaint. So the discovery grant, they found nothing? I didn't discover that they didn't previously know. I'm sorry? You're saying that they found nothing? I didn't discover that they didn't previously know. They alleged no facts to support the failure to supervise allegation throughout discovery, and that was not cited in the proposed amendment complaint. It merely added conclusory language to the existing counts. In addition, the trial court had previously determined 15 months prior that the supervision language of Section 3-108 was inapplicable because plaintiff had failed to allege that in his complaint. So between, you know, in those 15 months, it was never amended to allege the failure to supervise. And the trial court on August 14, 2012, found that Section 5-2424 of the Illinois School Code did not impose a duty to supervise. It's important to note here that plaintiffs have not cited and cannot cite to a case imposing the 5-24-24 duty to supervise under the Illinois Court Community Act. It's not necessary under the Hayes case for the parties to go through the process of filing an amended complaint and then a motion to dismiss when the court may consider the ultimate efficacy of the claim at the time the amended pleading is proposed. So because plaintiff has not shown that they would have cured a defect by the amended pleading, no further analysis is needed as plaintiffs have not met all four factors. However, they've not met other factors as well. I alluded to the fact that plaintiff had had previous opportunities to amend the complaint. The Regas case said that plaintiff must file a proposed amendment within a reasonable length of time and when ample opportunities to change theories occur, yet the plaintiff does not change them, to allow the plaintiff to haul the defendant back into court under a different theory prejudices that defendant. This case is not your typical pleading stage case. This case had been pending for three years. It had gone through extensive discovery. The motion for summary judgment had been filed. It had been fully briefed. It had been fully briefed to the fact that plaintiff had filed their response, but not mentioned one word about these new allegations. Yet a few days later, the motion for leave to amend was filed. Here, the motion for leave to amend was filed one week before the hearing on the motion for summary judgment. As I mentioned, it was filed 15 months after the court brought to plaintiff's attention that the claim on the duty to supervise was inapplicable because plaintiff had not alleged the duty in their complaint. It was filed after plaintiffs had already twice amended their complaint, and it was filed after the parties had fully briefed the motion for summary judgment. So because plaintiff cannot meet all four of the Hays factors, the court did not abuse its discretion in denying plaintiff's motion for leave to amend the complaint, and we ask that the trial court's order be sustained. Thank you. Thank you, counsel. Rebuttal. When counsel and the court were addressing this issue of whether or not the Tort Immunity Act was intended to absolve intentional acts, I disagree with her conclusion and argument on that regard. The statute in question, Section 2-201, indicates, except as otherwise provided by statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission, one in determining policy when acting in the exercise of discretion, even though abused. In other words, the language is not even if intentional conduct. For whatever reason, the legislature used the term abused. No one has brought out a dictionary today what abused actually means. Is it possible to abuse someone negligently? Does it only mean intentional conduct? What is the meaning of that word as opposed to saying that even though abused versus even though it's intentional? When the Valentino court was faced with that question, it did not have a problem finding that there was no immunity or at least allowing a jury to decide that question. I think the Valentino case is somewhat distinguishable to the extent of the conduct in that case versus our case. But I think Valentino stands for the principle, what is the conduct as opposed to how long it occurred or how many times. In the Valentino case, there was numerous additional instances of abuse and physical conduct on the part of the defendant. On the other hand, the court's decision when it decided Valentino, it referred to that there were numerous acts, which was sufficient. It didn't need hundreds of acts to arrive at the decision that the numerous acts in that case were intentional and they did not deserve the cloak or protection of immunity in that case. More also, counsel refers to two other cases in their brief at least. The Bloomingdale case in which the court said that it had to do with corrupt and malicious conduct is something that would still allow immunity. But in that case, it was a 2001 case and they were looking for a common law exception. The court in the first district said we're not going to waive the immunity standard under that case. In the Chicago flood case they cited also, it was one in which it was a municipality. It wasn't a school case like this one. Also, it had to do with flood and contracting issues and not at all like this one involving intentional conduct, involving serious injuries. Ultimately, we believe resulted in the death of this boy. One benefit of being in a case from the time the client walks in the door until you appear in the appellate court is having attended every deposition, every hearing, filed every pleading, respiled to every pleading, including here in the appellate court. When counsel said there was all kinds of time in that time frame before we filed a motion to amend, she wasn't there for the depositions and I weren't. However, we took five depositions less than a month before I filed the amended pleading. We had taken Mr. Cherone's deposition not until October and fall of that year. So when this issue of supervision was out there, I wasn't able to confirm those facts that I felt were important to raise an amended complaint and bring it to Judge Doyle's attention. And I wanted to get these additional students deposed as well. So yes, it did take some time, but I don't think that it is unimportant that the case was not in the ready for trial. There was no trial date at all. There was no disclosure of experts. There was nothing going on in this case that could result in prejudice other than the fact they don't like the idea that we have an additional cause of action that we filed, a cause of action based on Mr. Cherone's admission of a duty to supervise. I don't think that they could get around that. What is your genuine issue of material fact that would preclude summary judgment? In this case? Yes. The intentional conduct. There were two things. One, we've alleged that the policy in question was one that they had to follow. I disagree with counsel in which she said that the handbook itself calls it guideline. I didn't see it in there. It's in the record. It said that they have a duty to work with the parents. The idea is to notify the parents. In this case, this went on for three days. They never had a hint that their son was in trouble or undergoing these interrogations. So, one, I think it was a question of fact, at least, were they following the policy or not, or is there claiming it was a discretionary? And secondly, was it intentional conduct or not? As Valentino said, it was a question of fact. Thank you. You're excused. The court will take the case under advisement and call the next case.